MIRANDA KANE (CSBN 150630)
JULIA M. BREYER (CSBN 284706)
KANE+KIMBALL LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 704-1400
Email: mkane@kanekimball.com
Email: jbreyer@kanekimball.com

Attorneys for defendant KISHORE PALLAPOTHU

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| UNITED STATES OF AMERICA, | Case No. CR. 15-00427 BLF |
|---|---|
| Plaintiff, | **DEFENDANT KISHORE PALLAPOTHU'S SENTENCING MEMORANDUM** |
| v. | |
| KISHORE PALLAPOTHU et al., | Sentencing Date: January 14, 2019 |
| Defendants. | Time: 9:00 a.m. |
| | Place: Beth Labson Freeman, Courtroom 3, 5th Floor |

## I. INTRODUCTION

After emigrating from India to continue his education, Kishore Pallapothu worked hard for decades to fulfill the American dream and live up to his parents' expectations, climbing the ranks from software engineer to business founder and starting his own family. Succumbing to self-imposed pressure to continue to succeed, he shattered that dream and his family's trust by both engaging in a fraudulent visa application scheme and asking people to lie on his behalf to avoid detection. Regrettably, in doing so he involved his own family members without their knowledge. Mr. Pallapothu is profoundly ashamed of his conduct and committed to righting his wrongs, as his post-offense conduct demonstrates: he admitted his misconduct and the extent to

which he hid it from his relatives, ensured blame did not unfairly lie on others; and he has agreed to pay nearly 80% of his $2.5 million order of forfeiture within ten days of sentencing. Further, despite his plea and his agreement to substantial forfeiture, Mr. Pallapothu agreed not to claim a Guidelines reduction for acceptance of responsibility and instead receives additional points for obstructing justice; this represents a five-point swing in the applicable guidelines range where he might otherwise be eligible for a probationary sentence.

Mr. Pallapothu and the government entered into a plea under Rule (c)(1)(C) of the Federal Rules of Criminal Procedure, which provides that a reasonable and appropriate disposition is as follows: "a term of imprisonment between 33 and 41 months, a forfeiture money judgment in the amount of $2,500,000, 3 years of supervised release, and a special assessment in the amount of $300." Plea Agreement ¶ 8. Like Probation and the government, Mr. Pallapothu submits that the low end of the agreed-upon range—33 months' imprisonment—is sufficient but not greater than necessary to achieve all of the sentencing objectives set forth in 18 U.S.C. § 3553(a).

## II.   PERSONAL BACKGROUND

Born in 1973 in southeast India, Mr. Pallapothu lived there for the first 22 years of his life along with his parents and three younger siblings. Presentence Report ("PSR") ¶¶ 42-45. Mr. Pallapothu watched his father work very hard, traveling often, to support their family; at a young age, he aspired to do the same. *See id.* ¶ 44. At 22, after graduating from college with an engineering degree, Mr. Pallapothu moved to Texas to pursue a graduate degree at Texas A&M in computer science. *Id.* ¶¶ 45, 53. It was difficult for him to live halfway across the world from his family, but Mr. Pallapothu persevered, committed to honoring his family's confidence in his ability to build a successful career in the United States. Each of his siblings followed suit, emigrating to the United States and Canada, but Mr. Pallapothu was first. Upon completing his degree, he began working at Oracle as a software engineer. *Id.* In 2000, Mr. Pallapothu moved

to Silicon Valley. *Id.* ¶ 45. He has lived and worked in Santa Clara County ever since, along with his wife, whom Mr. Pallapothu met online and married just months later after returning briefly to India to meet her in person. *Id.* ¶ 47.

Mr. Pallapothu has always been the primary breadwinner for his family while his wife has been largely a stay-at-home parent to the couple's two young daughters, now aged 7 and 12. *Id.* ¶¶ 47, 55-50. In his early days in Silicon Valley, he worked as a software engineer at two different technology companies. *Id.* ¶¶ 59-60. In 2003, he began operating a series of his own software consulting, training, and staffing companies in the Bay Area. *Id.* ¶¶ 58-60. He was fortunate to enjoy enough success in these endeavors to invest in commercial property and opened a property management company to oversee his holdings. *Id.* ¶ 58.

This case, which was indicted in 2015, has taken its toll on Mr. Pallapothu. The stress has led him to engage in behavior he is not proud of: he has grown more solitary, become short-tempered, and begun drinking more than he would like. *Id.* ¶ 51. Knowing time in custody is certain, Mr. Pallapothu hopes to take advantage of the opportunity to participate in substance abuse counseling. *Id.* ¶ 52. Mr. Pallapothu's wife has remained supportive throughout this case. He has not yet told his young daughters about this case, though he knows he will have to before serving time in custody. He dreads that conversation. Above all, he is worried about how his inevitable absence will impact his family in both the short and long terms.

### III. A SENTENCE OF 33 MONTHS IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SATISFY THE GOALS OF SENTENCING

#### A. The Presentence Report

Mr. Pallapothu agrees with the Guidelines calculation set forth in the Presentence Report ("PSR"), which mirrors the parties' Plea Agreement. The PSR sets Mr. Pallapothu's base offense level at 11, which is increased by three points for the number of visa applications at issue, four points for Mr. Pallapothu's role as an organizer-leader, and two points for obstruction

of justice, resulting in an adjusted offense level of 20.  PSR ¶¶ 23-33.  Mr. Pallapothu has waived his claim to acceptance points.  Mr. Pallapothu has no prior criminal record and is therefore a Criminal History Category I.  *Id.* ¶ 34-40.  Mr. Pallapothu agrees that the appropriate resulting Guidelines range is 33-41 months.  *Id.* ¶ 65.  Like the government, Mr. Pallapothu agrees with Probation's recommendation that the appropriate sentence in this case is 33 months' imprisonment.  PSR Recommendation at 3.

Mr. Pallapothu's only objection to the PSR is to Probation's forfeiture recommendation on the report's final page, which still lists real properties—items 3 through 5—as being subject to forfeiture by the government.  However, pursuant to the forfeiture agreement the parties entered into on December 9, 2019, Mr. Pallapothu has agreed to satisfy his $2,500,000 forfeiture obligation by an initial cash payment of $1,972,000—which he has saved over the course of the many years this case has been pending—followed by monthly installments beginning upon his release from custody.  The government already has agreed to release the lis pendens on the listed properties and the removals will be recorded shortly.  *See* Kane Decl. ¶ 2 & Ex. A (Forfeiture Agreement).  Accordingly, the properties currently listed as forfeited items at 3 through 5 should not be included in the Court's judgment and commitment order.

**B.     Nature and Circumstances of the Offense**

Mr. Pallapothu acknowledges that this is a serious offense and does not seek to minimize the gravity of his behavior by urging a low-end sentence.  Still, the specific nature and circumstances of his conduct and the resulting Guidelines calculation warrants a sentence at the bottom end of the Guidelines range.

First, while not a legal defense, the vast majority of visa beneficiaries in this case would have entered the United States with valid H-1B visas notwithstanding the falsities Mr. Pallapothu

included in their petitions.  Mr. Pallapothu acknowledges that it was wrong to misstate the length of time of the beneficiaries' jobs at the end client, which allowed him to place the beneficiary in a different job with a different sponsoring employer.  The H-1B visa recipients were ultimately placed in jobs, bringing value to the companies, paying taxes, and contributing to the local economy as the H-1B program intends.  While Mr. Pallapothu's fraud undermined the integrity of the immigration system, it was not akin to other frauds—where, for example, a vulnerable victim loses his life savings—that destroy people's lives.  Indeed, neither the government nor Probation has identified any victims who suffered financial losses as a result of the scheme.

      Second, Mr. Pallapothu notes that as part of the plea agreement he agreed to waive his ability to argue for a Guidelines reduction for acceptance of responsibility.  Mr. Pallapothu recognizes and agrees that forfeiting those points is the just price he must pay for involving innocent family members in his fraud.  He also agreed to an additional two Offense Conduct points for his obstructive conduct.  The resulting five-point swing is significant: with the acceptance points, Mr. Pallapothu's adjusted offense level would have been 17, resulting in a range of 24-30 months—as much as a 17-month difference from the indicated Guidelines sentence here.  As the PSR notes, Mr. Pallapothu entered a guilty plea and was cooperative at his probation interview.  *Id.*  Typically, this is enough to earn the requisite acceptance reduction.  The two-pronged impact of the sanction—obstruction without acceptance—is arguably more pronounced here as Mr. Pallapothu emphasized that responsibility for the conduct lay solely with him and ultimately convinced the government to dismiss the charges against his co-defendants.  While the parties agreed in the Plea Agreement, and Probation concluded in the PSR, that this is not one of the extraordinary cases in which both adjustments apply, the volume and extent of Mr.

Pallapothu's admissions reflect a sincere acceptance of responsibility that warrants a sentence at the bottom end of the Guidelines range.

### C.     History and Characteristics of the Defendant

The history and characteristics of Mr. Pallapothu also warrant a sentence at the bottom of the Guidelines range for at least two reasons. First, the aberrant nature of the conduct warrants a low-end sentence. Mr. Pallapothu erred tremendously. But this sole lapse in judgment must not negate a lifetime of good character and hard work. Indeed, this is Mr. Pallapothu's first conviction. PSR ¶¶ 34-40. His complete lack of a criminal history should mitigate in favor of a sentence at the bottom of the Guidelines range. *See United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (holding that a "complete lack of criminal history" is properly considered a "mitigating factor" that was not fully accounted for by the defendant's placement in Criminal History Category I under the Guidelines).

Relatedly, Mr. Pallapothu's record on pretrial release also warrants a sentence at the bottom end of the applicable range. Remarkably, Pretrial Services has not reported any violations in the five-plus years that Mr. Pallapothu has been on pretrial supervision. PSR ¶ 5. Reflecting its trust in him, after his first year of supervision, the Court modified Mr. Pallapothu's release conditions to allow him to travel outside of this District without prior permission from the Court. Dkt. No. 19. He has proved himself worthy of the Court's good faith. Mr. Pallapothu's strong performance on pre-trial release is a good indicator of his ability to follow rules. He has demonstrated his respect for and adherence to the rules of the Court. There is no reason to doubt that he will repeat this performance while on supervised release.

Third, Mr. Pallapothu is dedicated to his family. He is the sole breadwinner for his family, and any period of incarceration will hurt his wife and daughters financially. But beyond

that, Mr. Pallapothu is a fundamental emotional presence in their lives.  He is a loving and supportive father to his children, displayed by the hours he spends helping them with their homework and his involvement in their extracurricular activities.  *See* PSR ¶ 38; *see also* Decl. of Miranda Kane ("Kane Decl.") ¶ 3 & Ex. B at 1 (Letter of Gopala Krishna Rao Pallapothu) and 3 (Sangeeth Nair Letter).  Put simply, any period of incarceration will be devastating to his family.  A sentence at the low end of the agreed-upon range affords the Pallapothu family a glimmer of hope that they will be able to move forward from this dark stain on Mr. Pallapothu's otherwise productive life.

  Mr. Pallapothu's support is not limited to his family, either; to the contrary, he makes a point to support others in his community.  Most recently, he has participated in a grocery rescue program, helping to deliver food that grocery retailers donate to agencies that feed the hungry.  In recognition of his participation, Mr. Pallapothu has received a Volunteer Service Award and a commendation from his congressman.  *See* Kane Decl. ¶ 4 & Exs. C (Certificate of Congressional Recognition) and D (County of Santa Clara Certificate of Commendation).  Beyond these organized activities, Mr. Pallapothu helps the less fortunate in other small, yet tangible, ways.  A friend describes how, after becoming the landlord at a residential property where one tenant was months behind in rent, Mr. Pallapothu spoke with the tenant, forgave the back-rent, and permitted him to stay rent-free for several months.  *See* Ex. B at 2 (Jeevan Zutshi Letter).  Generous and empathetic, he is the type of man who gives money to the homeless instead of driving by or averting his gaze.  *Id.*  Mr. Pallapothu also strives to pass on to his daughters the importance of supporting others in the community.  *Id.* at 1.

### D. The Need to Avoid Unwarranted Sentencing Disparities

A 33-month sentence will avoid unwarranted sentencing disparities. Most recently, in *United States v. Prasad*, No. 18-cr-368-CRB, the defendant was convicted at trial of visa fraud and aggravated identity theft in connection with submitting 19 petitions for H-1B visas containing false statements for work to be performed at Cisco, forging Cisco documents, and using Cisco digital signatures without authorization. The government requested a 76-month sentence. Along with an order of forfeiture, the court sentenced Prasad to 36 months' imprisonment. Notably, Prasad was sentenced to only 12 months on the visa fraud charges, and that is the relevant comparator; his ultimate 36-month sentence resulted from mandatory consecutive 24-month sentence on the aggravated identity theft charges, which are not present here.

Other recent sentences for visa fraud have hovered around the one-year mark. For example, in *United States v. Aiyaswamy*, No. 15-cr-568-LHK, the defendant made numerous false statements in connection with over 25 fraudulent applications for H-1B visas. She was sentenced to 13 months' imprisonment plus a fine on three counts of visa fraud. Similarly, the defendant in *United States v. Wang*, No. 12-cr-581-EJD, was sentenced to 12 months' imprisonment plus forfeiture for submitting hundreds of fraudulent applications for student visas.

Moreover, at least one defendant recently sentenced for visa fraud in this District received a split sentence. In *United States v. Patwardhan*, No. 13-cr-200-EJD, the defendant was convicted of two counts of visa fraud for making false statements in visa petitions for 19 applicants for H-1B visas, falsely stating that the beneficiaries had jobs at Gilead by altering and fabricating contracts and statements of work for the jobs. Patwardhan received a 10-month split sentence in conjunction with an order of forfeiture. Notably, outside of this District, defendants

have received sentences of straight probation for submitting up to 100 false petitions for H-1B visas. *See United States v. Saksena*, Judgment, Dkt. No. 54, No. 16-cr-134-1-LM (D.N.H. Aug. 9, 2017) (probationary sentence plus forfeiture for defendant convicted of making false statements to the government for submitting 45 false H-1B applications); *United States v. Kudera*, No. 16-crt-00056-JHM (D. Vt. Feb. 7, 2017) (probationary sentence along with $1 million forfeiture and fines for defendant convicted of conspiracy to commit visa fraud for submitting 100 false H-1B application).

Lastly, published data from the United States Sentencing Commission reflects that short periods of imprisonment are typical for immigration offenses. In the Ninth Circuit for fiscal years 2015-2017, the average sentence for cases where § 2L2.1 was the primary sentencing guideline for defendants in Criminal History Category I, like Mr. Pallapothu, is only six months' imprisonment. *See* Kane Decl. ¶ 5 & Ex. E (Table 14AG – 9th Cir). In this District, that average shrinks to just five months. *See* Ex. F (Table 14AG – NDCA). Mr. Pallapothu is not the type of offender whose conduct and character requires more than five or six times these averages.

### E.     A Low-End Sentence Satisfies the Purposes of Punishment

Finally, the purposes of punishment will be adequately served by a sentence of 33 months' imprisonment. As a father to two young daughters and a man who—aside from his week in jail on this matter—has never been to prison, separation from his family for any period of time is retribution enough. The large forfeiture Mr. Pallapothu has agreed to pay is also a form of retribution. *See United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (concluding that forfeiture as part of criminal sentencing constitutes punishment). Mr. Pallapothu also faces myriad collateral punishments that may interfere with his business and, thus, ability to continue to provide for his family—including concerns about lenders cutting off financial relationships.

As demonstrated by his perfect performance on pretrial release, Mr. Pallapothu does not pose a risk of future fraudulent behavior. First, pursuant to his Plea Agreement, Mr. Pallapothu completed the paperwork to dissolve Horizon, the company through which he submitted false visa petitions, months ago. *See* Dkt. No. 220 ¶ 15; *see also* Kane Decl. ¶ 6 & Exs. G and H. There is no risk that Mr. Pallapothu will submit false applications through that or any other staffing company. He has learned his lesson. The stress of this case and time away from his family are not episodes he wishes to repeat.

Nor is more than 33 months in custody necessary to further general deterrence. Research has shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes & Functions of Sentencing*, 34 Crime & Just. 1 (2006). Further, "there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y. 2006) (citing Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev 67, 80 (2005), and Elizabeth Szockyj, *Imprisoning White Collar Criminals?* 23 S. Ill. U. L.J. 485, 492 (1998)). Mr. Pallapothu will serve time in substantial prison sentence. Thirty-three months, particularly coupled with the $2.5 million forfeiture order, is certainly long enough to deter others from engaging in visa fraud while giving a reasonable nod to Mr. Pallapothu for the mitigating facts outlined above. More time in custody is not necessary to achieve the purposes of § 3553(a)(2).

## IV.     CONCLUSION

Considering all of the § 3553(a) factors, and as Probation and the government agree, a sentence of 33 months, three years supervised release, and a $2.5 million forfeiture order is sufficient but not greater than necessary to comply with the aims of sentencing. Mr. Pallapothu

also asks that he be allowed to self-surrender to a facility as designated by BOP on or before April 15, 2020.

Date: January 7, 2020                               /s/ *Miranda Kane*
                                                    MIRANDA KANE
                                                    KANE+KIMBALL LLP
                                                    Attorneys for Kishore Pallapothu